**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------- X

**VOF BOUWCOMBINATIE EGMOND,**

        **Plaintiff,**

       **- against -**

**OCEANTEAM POWER & UMBILICAL**
**B.V., OCEANTEAM B.V. and**
**OCEANTEAM A.S.A. (f/k/a**
**OCEANTEAM POWER & UMBILICAL**
**A.S.,**

        **Defendants.**

------------------------------------------------- X

**OPINION AND ORDER**

**09 Civ. 4023 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/6/09

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

On April 22, 2009, VOF BouwCombinatie Egmond ("VOF" or "plaintiff") commenced this action and requested an ex parte order directing attachment and garnishment ("Attachment Order") of up to $16,980,500 of the assets of Oceanteam Power & Umbilical B.V. ("OPU"), Oceanteam B.V., and Oceanteam A.S.A (together with OPU and Oceanteam B.V., the "defendants"). On May 4, 2009, this Court issued an Attachment Order granting VOF's request to attach the funds of defendants. The Attachment Order mandated use of the U.S.

Marshal for service of process, allowed for continuous service of the garnishee banks only with the consent of individual banks, and permitted garnishee banks to impose a "reasonable" fee to compensate them for the costs of processing the Attachment Order and restraining funds.

Since the issuance of the Attachment Order, J.P. Morgan Chase & Co., J.P. Morgan Clearing Corp. (U.S.), and J.P. Morgan Chase Bank (U.K.) ("the JP Morgan Garnishees") have instituted policies with respect to the Attachment Order, including the charging of a fee of $125 per day.  VOF now requests that the Court issue an order providing that (1) VOF is not required to pay any fee to the JP Morgan Garnishees; (2) that supplemental service may be made by any attorney, paralegal or other employee of Eaton & Van Winkle LLP; and (3) that service of the Attachment Orders on the JP Morgan Garnishees be deemed continuous from the time of service until 10:00 a.m. on the next business day.  For the reasons that follow, VOF's request is denied.

## II.    BACKGROUND

### A.    Facts

On May 26, 2005, Noordzee Wind Investor I CV entered into an Engineering Procurement & Construction contract with VOF in which VOF agreed to develop the Offshore Windpark Egmond aan Zee, located off the Dutch

coast, and which was to comprise "36 wind turbines with monopile foundations, associated subsea, substation and onshore cables connected to the electrical grid and a meteorological measurement mast (the "Project")."[1]  On or about March 9, 2006, VOF entered into a Cable Transportation, Handling and Installation subcontract with OPU, in which OPU agreed to "carry out cable loading, transportation, cable installation and subsea trenching/burial works in connection with the Project (the "Subcontract")."[2]  As part of its work under the Subcontract, OPU chartered the M/V Northern River.[3]

VOF's Complaint alleges that OPU breached the Subcontract by failing to keep the M/V Northern River under charter and delaying the performance of OPU's work beyond the summer of 2006 and by failing to "bury the cables to the intended depths of 3 meters below sea bottom close to shore and 1.5 meters below sea bottom elsewhere."[4]  Although VOF demanded that OPU complete all work required by the Subcontract, OPU refused to do so and

---

[1]     Complaint ("Compl.") ¶ 14.

[2]     *Id.* ¶ 15.

[3]     *See id.* ¶ 18.

[4]     *See id.* ¶¶ 20, 21.

eventually abandoned its work on the Project.[5]   VOF therefore alleges that it sustained damages equal to $12,980,500, which is the amount contractually agreed upon by the parties in the event of a breach by OPU.[6]

The Subcontract provides additionally that all disputes between VOF and OPU be resolved by arbitration in The Netherlands in accordance with the law of The Netherlands.[7]   Arbitration has commenced between the parties.[8]   The total amount VOF seeks to attach pursuant to this Rule B action is $16,980,500, which comprises the principal sum of $12,980,500; $3,000,000 in interest, estimated at six percent for four years; and $1,000,000 of attorneys' fees, disbursements, and arbitrator fees.[9]

## B.   Procedural History

---

[5]   *See id.* ¶ 23.

[6]   *See id.* ¶ 25.   VOF also alleges the same claim against Oceanteam B.V., as the successor entity of OPU, and Oceanteam A.S.A., by virtue of its execution of a guarantee that covers "the due performance of all obligations and liabilities of OPU in connection with the contract between OPU and the plaintiff," and alternatively as the alter ego of OPU.  *Id.* ¶¶ 8, 10, 13.

[7]   *See id.* ¶ 27.

[8]   *See id.* ¶ 28.

[9]   *See id.* ¶ 36.

On May 4, 2009, this Court entered an Attachment Order allowing for the attachment of defendants' funds up to $16,980,500.[10]  The Order directed that initial service be made by U.S. Marshal personally, and that any subsequent service of process be made personally, unless the garnishee consents to service of process by way of facsimile or other electronic means.[11]  The Attachment Order also provided that garnishees may request a "reasonable fee" from plaintiff.[12] Finally, the Attachment Order provided that a garnishee may consent to deem service continuous for a period not to exceed sixty days from the date of the Order.[13]

Initial service of the Attachment Order was completed by May 18, 2009.[14]  On June 18, 2009, the JP Morgan Garnishees gave notice to VOF that, in accordance with the terms of the Attachment Order, it intended to impose a fee of $125 per day for garnishment services.[15]  In addition, the JP Morgan Garnishees

---

[10]     *See* Attachment Order.

[11]     *See id.*

[12]     *Id.*

[13]     *See id.*

[14]     *See* 5/18/09 Marshal's Process Receipt.

[15]     *See* 7/2/09 Letter to the Court from VOF ("7/2/09 Letter").

declined to consent to continuous service and further refused to accept

supplemental service from anyone other than a U.S. Marshal.[16]  VOF now requests

relief from the Court.

## III.   LEGAL BACKGROUND AND STANDARD

### A.   Attaching After-Acquired Property

In *Reibor International Limited v. Cargo Carriers (KACZ-CO.)*

*Limited*, the Second Circuit considered whether a maritime plaintiff may attach

"after-acquired property" – i.e., property that was not in the hands of the garnishee

at the time the attachment order was served.[17]  In *Reibor*, plaintiff served an order

of maritime attachment on a garnishee bank at about 10:25 a.m., but the bank did

not receive the transferred funds until 2:21 p.m. that afternoon.[18]  The bank

attached the funds.  The district court vacated the attachment, holding that a

plaintiff may only attach funds that are in the hands of the garnishee at the time the

attachment order is served.[19]  The Second Circuit affirmed.  Addressing the

---

[16]    *See id.*

[17]    *See* 759 F.2d 262 (2d Cir. 1985).

[18]    *See id.* at 264.

[19]    *See id.* at 263.

permissibility of attaching after-acquired property under Rule B, the court first

noted that

> The Admiralty Rules themselves offer little guidance. Rule
> B does not mention attachment of after-acquired property.
> Two other rules, Rule C and Rule E, appear to contemplate
> service on garnishees actually in possession of the property
> to be attached, but neither addresses the issue of
> after-acquired property directly.[20]

Because federal case law also failed to provide guidance, the court

adopted, under federal common law choice of law principles, the New York rule

against attaching property not in the hands of the garnishee at the time of service.

Quoting Judge Joseph McLaughlin's commentary on New York practice, the court

found New York's law to be clear in this regard: "Where the order of attachment is

left with a third-party garnishee . . . the levy is *absolutely void* unless the garnishee

has some property belonging to the defendant or owes the defendant a debt *at the*

*time the order is left with him*."[21]  The court decided to adopt the New York rule

because "'a decision . . . contrary to the general rule of the state might have

---

[20]     *Id.* at 265.

[21]     *Id.* (quoting McLaughlin, Practice Commentary C6214:3) (emphases
added).

7

disruptive consequences for the state banking system'" and adopting state law "minimize[s] disruptive divergences between state and federal law."[22]

The court rejected Reibor's equitable argument against enforcing the New York rule in a case where the funds came into the garnishee bank mere hours after the attachment order was served. In rejecting this argument, the court dryly noted that "the rule works, to be sure, to the detriment of an attaching creditor, but that is simply the way the law was intended to operate."[23] Further, Reibor's proposed rule "could have considerable impact on international banking practices" and prove "extremely and unfairly taxing" on New York banks.[24]

In *ContiChem LPG v. Parsons Shipping Company*, the Second Circuit addressed whether a maritime plaintiff "could accomplish indirectly, by means of an order restraining to-be-attached property, that which it could not do directly in light of the well-established prohibition against maritime attachments of after-acquired property."[25] In an effort to circumvent *Reibor*'s prohibition on attaching after-acquired property, ContiChem obtained a temporary restraining

---

[22]     *Id.* at 266 (quoting *Det Bergenske Dampskibsselskab v. Sabre Shipping Corp.*, 341 F.2d 50, 55-56 (2d Cir. 1965)).

[23]     *Id.* at 268.

[24]     *Id.*

[25]     229 F.3d 426, 433 (2d Cir. 2000).

order from the district court preventing the bank from releasing any funds

belonging to the defendant that transferred through the bank.[26]  Once EFTs were

held pursuant to the restraining order, plaintiff served a maritime attachment order

on the bank and attached the funds that were then in the hands of the garnishee

bank.[27]

      The district court first found that the restraining order was invalid

under New York law and then vacated the Rule B attachment under *Reibor*.[28]  The

Second Circuit affirmed, holding that plaintiff "improperly attempted to

circumvent the rule against attachment of property not yet in [the garnishee bank's

hands]."[29]

      In *Winter Storm Shipping Limited v. TPI*, the Second Circuit held that

EFTs emanating from defendant's bank account are "property" belonging to

defendant subject to attachment.[30]  Upon receiving initial process of the

attachment order, the garnishee bank decided, without a court order, to place a

---

[26]    *See id.* at 429.

[27]    *See id.*

[28]    *See id.*

[29]    *Id.* at 434.

[30]    310 F.3d 263 (2d Cir. 2002).

hold on any funds that transferred through the bank emanating from the defendant's accounts.[31] In this respect, the bank effectively treated the service of process of the attachment order as being continually served. Once the bank held defendant's EFTs, plaintiff served supplemental process of the Attachment Order while the funds were at the bank and attached the funds.[32] The fact that the attachment was served *while the funds were at the bank*, the Court held, placed the case outside the ambit of *Reibor*'s well-established rule against attachment of after-acquired property.[33] Further, the case did not fall within the ambit of *Contichem* because the bank made the unilateral decision to place a hold on future transfers and plaintiff's actions were, therefore, "entirely blameless."[34]

In recent years, many district courts have begun to issue attachment orders that direct the garnishee to treat the order as continuously served for a day. Given the *Reibor* prohibition on attachment of after-acquired property and given that "'[a]n EFT may be in the possession of a financial institution for only a very short period of time,' and may move through the bank 'almost instantaneously,' it

---

[31]    *See id.* at 274 n.7.

[32]    *See id.*

[33]    *See id.*

[34]    *Id.*

10

follows that it would be virtually impossible for plaintiffs to attach EFTs unless

garnishee banks are permitted to accept continuous service."[35]  The continuous

service provision is thus "intended to avoid 'the absurdity, security problems, and

inconvenience of requiring the garnishee banks to accept service repeatedly

throughout the day.'"[36]  Indeed, "the absence of such a continuing service

provision – either by court order or by consent from the garnishee – would

inevitably result in the posting of lawyers and/or process servers at bank offices

around the clock in an attempt to capture EFTs at the precise moment of their

arrival."[37]

## B.    Continuous Service

Under Rule B of the Supplemental Admiralty Rules for Certain

Admiralty and Maritime Claims of the Federal Rules of Civil Procedure

("Supplemental Rules"), a "verified complaint may contain a prayer for process to

attach the defendant's tangible or intangible personal property – up to the amount

---

[35]    *DSND Subsea AS v. Oceanografia, S.A. de CV*, 569 F. Supp. 2d 339, 346-47 (S.D.N.Y. 2008) (quoting *Ullises Shipping Corp. v. FAL Shipping Co. Ltd.*, 415 F. Supp. 2d 318, 324 (S.D.N.Y. 2006), *overruled on other grounds by Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 446 (2d Cir. 2006)).

[36]    *Id.* at 347 (quoting *Ullises*, 415 F. Supp. 2d at 328).

[37]    *Id.*

sued for – *in the hands of garnishees named in the process*."[38]  No provision in the

Supplemental Rules authorizes a court to issue an attachment order that permits

continuous service.  Equally, "'[n]othing in the Admiralty Rules prohibits this

Court from issuing such an order.'"[39]  Notwithstanding the "well-established

prohibition against maritime attachments of after-acquired property,"[40] every court

in this district to reach the issue has held that it is *permissible* for a court to issue

an order directing that service shall be deemed continuous for a day[41] and for a

garnishee, without a court order, to consent to treat service as continuous for a

day.[42]  However, no court has held that a district court *must* authorize continuous

---

[38]     Supplemental Rule B(1)(a) (emphasis added).

[39]     *DSND Subsea*, 569 F. Supp. 2d at 347 (quoting *Ulli*ses, 415 F. Supp. 2d at 328).

[40]      *ContiChem*, 229 F.3d at 433.

[41]     *See DSND Subsea*, 569 F. Supp. 2d at 345-47.  *Accord Ullises*, 415 F. Supp. 2d at 328.

[42]     *See Navalmar (U.K.) Ltd. v. Welspun Gujarat Stahl Rohren, Ltd.*, 485 F. Supp. 2d 399, 410 (S.D.N.Y. 2007) ("[P]laintiff may not *compel* a garnishee to hold service of process for maritime attachment effective until such time as a *res* comes into the garnishee's possession or the garnishee answers, but the garnishee may agree to do so, and the garnishee's procedures will not vitiate an attachment as long as they are reasonable.").  *Accord Ythan Ltd. v. Americas Bulk Transport Ltd.*, 336 F. Supp. 2d 305, 307 (S.D.N.Y. 2004).

service and there is no caselaw discussing the parameters of a court's discretion in

this regard.

## C.   Specially Appointed Process Server

Supplemental Rule B provides that when serving an attachment order

that authorizes the attachment of intangible property such as EFTs,

> [T]he summons, process, and any supplemental process
> must be delivered to a person or organization authorized
> to serve it, who may be (A) a marshal; (B) someone
> under contract with the United States; [or] (C) someone
> specially appointed by the court for that purpose . . . .[43]

## IV.   DISCUSSION

### A.   Continuous Service

In *Cala Rosa Marine Co. v. Sucres Et Deneres Group*, I noted that

although I was "clearly permitted to include a continuous service provision in the

attachment order, [I was] not required to do so."[44]  I then declined to exercise my

discretion to direct banks to treat service as continuous, noting that

> (1) the Federal and Supplemental Rules make no provision
> for "continuous service," (2) the relatively recent
> innovation of authorizing continuous service circumvents
> the *Reibor* prohibition against attaching after-acquired
> property, and (3) the practice is disruptive to the New York

---

[43]   Supplemental Rule B(1)(d)(ii).

[44]   613 F. Supp. 2d 426, 431 (S.D.N.Y. 2009).

> banking industry and flouts the New York rule that *Reibor*
> adopted.[45]

I further noted that

> [i]f banks elect to treat the service as continuous – as the
> bank did in *Winter Storm* – they may do so; and if funds
> are subsequently attached, the overwhelming authority
> provides that no vacatur will follow. But absent the bank's
> consent, this Court does not believe it is wise to require
> New York banks to do what New York law does not
> require them to do."[46]

In this particular case, the JP Morgan Garnishees have declined to

consent to continuous service, and plaintiff therefore requests the Court to order it.

However, I see no reason to reconsider my decision in *Cala Rosa*. Just as I found

the United States forum to have little interest in the dispute in *Cala Rosa*, the same

can be said here: there is no reason to believe that defendant's property was in the

United States at the time this motion was filed or will be in the United States

before the arbitration is settled,[47] the merits of the dispute will be resolved in The

---

[45]    *Id.*

[46]    *Id.*

[47]    Indeed, plaintiff alleges only that it believes defendants have or will
shortly have assets in the district because "it is common practice for foreign
entities who engage in international transactions to make and receive payments in
U.S. dollar denominated electronic fund transfers." Compl. ¶ 33. In addition,
because foreign banks have relationships with and correspond with U.S. banks,
plaintiff expects that such transfers and payments in U.S. dollars will pass through

14

Netherlands according to the law of The Netherlands and pursuant to a mandatory

foreign arbitration clause, the operative facts all occurred abroad, and the parties

have no discernable ties to the United States. In light of this forum's very slight

interest in the dispute, there is little reason to impose a severe strain on a New

York bank[48] and to create disparities between New York and federal law.

---

garnishees in this district. *See id.* ¶ 34.

[48]    *Reibor* recognized that requiring banks to attach after-acquired EFTs "could have considerable impact on international banking practices" and prove "extremely and unfairly taxing" on New York banks. 759 F.2d at 268. In an amicus brief filed by an association of New York banks in *Consub Delaware LLC v. Schahin Engenharia Limitada*, 543 F.3d 104 (2d Cir. 2008), the banks explained the nature of these burdens, which have increased greatly in recent years. New York banks handle a large portion of all international funds transfers. *See* Brief for *Amicus Curiae* The Clearing House Association L.L.C. in Support of Defendant-appellant, at 10-11 (noting that as of June 29, 2007, "*daily* volumes of all funds transfers passing through, or ending in, New York average over \$4.2 trillion" and that the main electronic funds transfer system "processes over 330,000 payment orders" per day) (emphasis added)). As of August 2, 2007, several major New York banks were receiving over 100 attachment orders per day, seeking attachment of millions of dollars. *Id.* at 7. This Court was recently informed that, currently, leading New York banks receive numerous new attachment orders and over 700 supplemental services of existing orders *each day*. This is confirmed by the striking surge in maritime attachment requests in this district, which now comprise approximately one third of all civil cases filed in the Southern District of New York. As a consequence, New York banks have hired additional staff, and suffer considerable expenses, to process the attachments. *See id.* at 8 (noting that each attachment requires banks to amend "their software screens that list entities and other persons whose financial transactions must be blocked by banks"). The sheer volume of amendments to the software screens leads to many false "hits" of funds subject to attachment, which has allegedly introduced significant uncertainty into the international funds transfer process.

15

Moreover, I note that VOF has no specific reason to believe that defendants' funds will be in the district sometime in the next sixty days, and am therefore mindful of the burden that such order would have on New York banks. As garnishee J.P. Morgan Chase notes, in many cases the funds to be attached belong to bank customers, who wonder why the bank would agree to continuous service when neither the law nor this Court has required it.[49] J.P. Morgan Chase also notes that it has been necessary to expend resources to

> appease overseas clients who, first of all, have no idea what's coming at them, not only because they don't understand American jurisprudence, but also because [the Attachment Orders are] issued ex parte, and [] explain to customer service representatives overseas that this is why these funds are being held [so they may in turn advise the foreign defendants of what has happened to their funds].[50]

Given these considerations and the contemplation of Supplemental Rule B that attachment orders will be served only to acquire property "in the hands of

---

*See id.* at 8, 12. Finally, banks are understandably loath to be placed in the middle of international civil disputes with which they have no connection. *See id.* at 5; *see also Grain Traders, Inc.* v. *Citibank, N.A.*, 160 F.3d 97, 102 (2d Cir. 1998) ("These are matters as to which an intermediary bank ordinarily should not have to be concerned and, if it were otherwise, would impede the use of rapid electronic funds transfers in commerce by causing delays and driving up costs.").

[49]     *See* 7/23/09 Transcript of Oral Argument ("Tr.") at 13:21-24.

[50]     *Id.* at 14:2-9.

16

garnishees named in the process,"[51] I decline to grant VOF's request for an order of continuous service.

Nevertheless, in discussing the matter with VOF and J.P. Morgan Chase, I am troubled at what has become a "Catch-22" for Rule B plaintiffs in light of my decision not to require continuous service. J.P. Morgan Chase notes that in many instances, it may take "hours" for the bank to process an Attachment Order and conduct a search for funds in the district.[52] It therefore concedes that the probability of successfully attaching funds is "infinitesimally small," because even if funds are at the bank at the time the Order is served upon the bank, by the time a search is conducted, those funds may have already left the bank.[53] Thus, it appears that Rule B plaintiffs are left to hope either that the Court orders continuous service or that the garnishee banks consent to continuous service. If both decline to do so, as in this case, then an Attachment Order may have little

---

[51]     Supplemental Rule B(1)(a).

[52]     *Id.* at 8:17-24 ("The process, as it goes through JP [Morgan Chase], if the writ is initially served here in New York on a bank, it is faxed to JP Morgan's control center actually in Louisiana, where it's processed. It's then sent to their OFAC facility, which is actually located in Tampa, Florida, which is where the search is performed on the OFAC filter to see if any electronic funds transfers coming from overseas is made. So, in theory, yes, there is a delay of potentially hours, even.").

[53]     *Id.* at 11:4-13.

utility. Although the *Reibor* court noted that the New York "rule works, to be sure, to the detriment of an attaching creditor, but that is simply the way the law was intended to operate,"[54] I am also confident that the court did not intend for maritime attachment orders to be stripped of their utility if banks decline to consent to continuous service.

Considering the variability in the amount of time it may take for garnishee banks to process attachment orders and conduct a search of defendants' funds, I now hold that service of the Attachment Order should be deemed made at the time a search is conducted and funds are ascertained to be located in the bank. This solution ensures that Rule B plaintiffs are given a fair opportunity to utilize Attachment Orders, but also comports with *Reibor*'s holding that prohibits attachment of property acquired after service is made.[55]

---

[54]     *Reibor*, 759 F.2d at 268.

[55]     J.P. Morgan Chase argues that its policy of attaching only those funds present at the time the Attachment Order is physically handed to the bank is consistent with how in the old days, a vessel would have been arrested or seized. It contends that if the plaintiff were to serve the Order to the Marshal at 10:00 and the vessel sails at 10:05, but the Marshal arrives at the pier after that time and misses the vessel, the Marshal would also not be able to arrest the vessel. *See* Tr. at 10:17-22. However, J.P. Morgan Chase must agree that even if the vessel had arrived at the pier at 10:10, the Marshal appeared at 10:15, and the vessel was still docked, the Marshal would have no basis to fail to arrest the vessel. It would be curious indeed if the Marshal was forced to let the vessel go if it is determined that the vessel had not arrived at the pier until 10:10. It therefore makes sense to deem

18

## B.    Special Process Server

In *Cala Rosa*, I declined to appoint a special process server, noting that plaintiff might "post process servers at bank offices around the clock in an attempt to capture [funds] at the precise moment of their arrival."[56]  Nevertheless, VOF notes that the Attachment Order provides only that initial service be made by U.S. Marshal and that supplemental service be made "personally," but otherwise does not specify who should make supplemental service.[57]  VOF therefore argues that the Attachment Order "authorizes supplemental service to be made by the attorneys, paralegals or other employees of Eaton & Van Winkle LLP."[58]

Supplemental Rule B provides that "the summons, process, and any supplemental process must be delivered to a person or organization authorized to serve it, who may be (A) a marshal; (B) someone under contract with the United States; [or] (C) someone specially appointed by the court for that purpose . . . ."[59]  Thus, plaintiff may not designate its own process server absent appointment by the

---

service made at the time the search is conducted.

[56]    *Cala Rosa*, 613 F. Supp. 2d at 432.

[57]    *See* 7/2/09 Letter.

[58]    *Id.*

[59]    Supplement Rule B(1)(d)(ii).

Court.  Because the Attachment Order does not provide for the appointment of a

special process server, only service by the U.S. Marshal is appropriate under the

Order.  However, because of the burdensome costs associated with paying the U.S.

Marshal each time he or she makes personal service, I hereby order that

supplemental service may be made by facsimile or other electronic means.  VOF's

request for a special process server is denied, but supplemental service may be

made electronically.[60]

###    C.    A "Reasonable" Fee

J.P. Morgan Chase argues that its $125 per day fee is reasonable in

light of the number of employees and advisors that are involved in processing

attachment orders and conducting searches of funds.  To defend its fee, J.P.

Morgan Chase submitted the declaration of Eunice Almanzar, Vice President of JP

Morgan Chase Bank, N.A., who is "responsible for the oversight of JP Morgan

---

[60]    Although VOF notes, in its July 27, 2009 letter to the Court, that the
U.S. Marshal charges $8 per day for service of the Attachment Order by facsimile,
amounting to $3,600 if the Attachment Order is served on ten garnishees each day
for a period of 45 business days, these costs are surely much less than the costs of
personal service and certainly not prohibitive.

Chase's compliance with Rule B Maritime Writs of Attachment as issued by the

United States District Court for the Southern District of New York."[61]

Almanzar notes that when an Attachment Order is received, outside

counsel must be notified and the Order is reviewed by the Court Orders and Levies

Department.[62] After a legal review is completed, the Order is then forwarded to

the Maritime Attachment Department to determine if the matter should be added to

the Office of Foreign Assets Control ("OFAC") filter.[63] Once the matter is added

to the filter, all wires are scanned for funds passing through J.P. Morgan, and if

there is a match, the funds are restrained for review by the Maritime Team.[64] If the

match is confirmed, the Maritime Attachment is then sent to outside counsel.[65]

Once outside counsel confirms a match, the funds are then moved to another

---

[61]    7/22/09 Declaration of Eunice Almanzar, Vice President of J.P. Morgan Chase ("Almanzar Decl.") ¶ 2.

[62]    *See id.* ¶ 5.

[63]    *See id.* ¶ 6. J.P. Morgan Chase notes that the filter was originally set up to allow the Government to search for terrorist funds and was not designed for the adding and removal of names for maritime attachment purposes. *See* Tr. at 29:9-12.

[64]    *See* Almanzar Decl. ¶ 7.

[65]    *See id.*

account and are tracked and logged.[66]  The Maritime Team then sends a message to the sender advising that the funds have been restrained.[67]  Another message is sent to client managers so that these managers can advise their clients of the restrained funds.[68]

J.P. Morgan also conducts a search of accounts or assets that may be held at the bank.[69]  This search consists of the entering of the Attachment Order into a tracking system, a second search by the bank's Verifications Group, and a final review by in-house counsel.[70]

Almanzar informs the Court that the bank is often threatened by litigation because of maritime attachments and must frequently act as "a facilitator between the Bank's client, the client's customer, and the Plaintiff's counsel."[71] She notes additionally that outside legal fees and expenses solely for writs of maritime attachment were "in excess of $300,000.00 in 2008, and are still in

---

[66]    *See id.* ¶¶ 8, 9.

[67]    *See id.* ¶ 10.

[68]    *See id.* ¶ 11.

[69]    *See id.* ¶ 17.

[70]    *See id.* ¶¶ 18-20.

[71]    *Id.* ¶¶ 12, 15.

excess of $20,000.00 a month in 2009."[72]  She further asserts that the bank

assesses a $125 legal processing fee on all other asset-based orders served on J.P.

Morgan Chase.[73]

I am mindful of the burdens and costs that Attachment Orders have

imposed upon garnishee banks.  Nevertheless, I also note that much of the

additional costs incurred by J.P. Morgan Chase are the result of its own decision to

decline to consent to continuous service.  Indeed, J.P. Morgan Chase concedes that

when it is directed by a court to deem service continuous, a name is entered into

the OFAC filter once, and it is monitored throughout the term.[74]

VOF argues that it should not bear the costs that J.P. Morgan Chase

incurs as a result of having to maintain client relationships.[75]  I do note that a

significant amount of the work discussed in Almanzar's declaration pertains to the

maintenance of J.P. Morgan Chase's client relationships.  I am also aware that in

---

[72]     *Id.* ¶ 22.

[73]     *See id.* ¶ 23.

[74]     *See* Tr. at 22:23-23:3.  JP Morgan Chase Bank explains that its
decision to decline to consent to continuous service results in the bank having to
add and remove the defendants' names from the OFAC filter every day.  *See id.* at
29:15-20.

[75]     *See id.* at 28:5-8 ("Frankly, I don't believe that's the responsibility of
our clients, Rule B plaintiffs, to help JP Morgan maintain good client
relationships.").

23

processing other asset-based orders, the bank likely must also engage in communications with its clients as to why their assets are being seized and must also act as the middleman between its clients and those seizing its clients' funds. In those cases, J.P. Morgan Chase notes that it charges only $125 for the processing of such orders.

Because the incremental costs therefore appear to be associated mainly with the bank's need to undertake the same lengthy procedures of adding and removing names each time the Attachment Order is served upon it – procedures that can be eliminated if the bank consents to continuous service – I find the $125 per day fee to be exorbitant. Nevertheless, because I appreciate that maritime attachments create additional burdens not present in other forms of asset-based orders, I find a one-time fee of $250 to be "reasonable." Because plaintiff has represented to the Court that it paid $125 at the time of initial service,[76] plaintiff must pay the remaining balance the next time it serves the JP Morgan Garnishees with the Attachment Order.

### D.    Adjustment of Amount of Attachment Order

Finally, I note that I granted plaintiff's request to attach $3,000,000 in interest, calculated at six percent for four years, and $1,000,000 in attorneys' fees

---

[76]    *See id.* at 27:2-6.

and arbitration costs.  It seems unlikely that arbitration will take four years, and I

rarely order interest to be calculated on a basis of more than three years.  Also,

$1,000,000 in attorneys' fees and arbitration costs appears to be excessive.

Although VOF seeks almost thirteen million dollars in damages in this action, my

practice is to cap attorneys' fees and arbitration costs at $200,000 no matter the

amount of damages sought.  The amount to be attached under the Attachment

Order is therefore amended to $15,659,983 ($12,980,500 in principal, $2,479,483

in interest, calculated on three years, and $200,000 in attorneys' fees and

arbitration costs).

## V.    CONCLUSION

For the reasons stated above, VOF's request is denied.  Although I

decline to direct the JP Morgan Garnishees to accept continuous service,

supplemental service may be made by facsimile or other electronic means.  The

Order of Attachment shall be deemed served at the time the JP Morgan Garnishees

conduct a search for funds.  The JP Morgan Garnishees may charge a one-time

processing fee of $250.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            August 6, 2009

## - Appearances -

**For VOF:**

Alan Van Praag, Esq.
Edward W. Floyd, Esq.
Eaton & Van Winkle LLP
3 Park Avenue
New York, NY 10016
(212) 779-9910


**For J.P. Morgan Chase:**

Kevin L. McGee, Esq.
Rawle & Henderson LLP
The Widener Building
One South Penn Square
Philadelphia, PA 19107
(215) 575-4200

Matthew Marino, Esq.
Rawle & Henderson LLP
14 Wall Street
27th Floor
New York, NY 10005
(212) 323-7070